UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
SHIELDALLOY METALLURGICAL        :
CORPORATION,                     :
                                 :     HONORABLE JOSEPH E. IRENAS
            Plaintiff,           :
                                 :  CIV. ACTION NO. 09-4375 (JEI/JS)
      v.                         :
                                 :         OPINION
STATE OF NEW JERSEY              :
DEPARTMENT OF ENVIRONMENTAL      :
PROTECTION, et al.,              :
                                 :
            Defendants.          :
                                 :
```

**APPEARANCES:**

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI, ESQS.
By:  Dennis J. Krumholz, Esq.
1 Speedwell Avenue
Morristown, NJ 07962
          Counsel for Plaintiff

ATTORNEY GENERAL OF NEW JERSEY
By:  Andrew D. Reese, Esq.
     Jung W. Kim, Esq.
25 Market Street
P.O. Box 093
Trenton, NJ 08625
          Counsel for Defendants

**IRENAS**, Senior District Judge:

This dispute involves the decommissioning of a low-level radioactive waste site in Newfield, New Jersey ("the Newfield Site"), owned by Plaintiff Shieldalloy Metallurgical Corporation. Shieldalloy has taken steps toward permanently containing, at the

Newfield Site, hazardous by-products of its manufacturing operations.[1]  Defendant, the New Jersey Department of Environmental Protection ("NJ DEP")[2] has informed Shieldalloy that it intends to order Shieldalloy to remove the waste from the Newfield Site and transport it for off-site disposal.  (Senior Cert. Ex. S, T)

Shieldalloy asserts that NJ DEP's actions violate a Settlement Agreement the parties entered into during Shieldalloy's prior bankruptcy case.  According to Shieldalloy, NJ DEP knew all along about Shieldalloy's plans to contain the waste on-site, and never voiced an objection until the United States Nuclear Regulatory Commission ("NRC") took steps toward approving on-site containment.[3]  Only after that, in 2009, did NJ DEP assume

---

[1]  The by-products are "baghouse dust" and "slag," containing uranium and thorium.  According to Defendant New Jersey Department of Environmental Protection, the Newfield Site contains approximately 65,800 cubic meters of radioactive waste, enough to fill about 65,800 "regularly sized refrigerators."  (Moving brief, p. 1)

[2]  The Complaint also names as a Defendant Mark Mauriello, Acting Commissioner of the NJ DEP, in his official capacity only.

[3]  In April, 2004, the NRC issued "Guidance for a Long-Term Control Possession Only License at the Shieldalloy Newfield Site," which outlined NRC requirements for on-site containment.  (Senior Cert. Ex. L)  In June, 2004, NJ DEP Commissioner Bradley Campbell wrote to the NRC "express[ing] [his] deep concern" that on-site containment, and approval by the NRC, "would essentially create a low-level radioactive waste disposal facility in New Jersey."  (Senior Cert. Ex. M)

regulatory authority over decommissioning of the Newfield Site, whereupon it notified Shieldalloy of its intent to force Shieldalloy to remove the waste, rather than contain it on-site.

Shieldalloy asserts that it cannot afford the costs associated with off-site disposal.  The Complaint primarily seeks declaratory and injunctive relief, asserting various state law contract claims, and a public nuisance claim.

NJ DEP moves to dismiss, asserting, among other things, that the Court lacks subject matter jurisdiction over this suit.  The Court agrees that it lacks subject matter jurisdiction, therefore the Motion will be granted.

## I.

In November, 1992, Shieldalloy created a "decommissioning plan" which would allegedly "provide for safe and permanent on-site capping of [radioactive waste] on an approximately 12-acre portion of the 68-acre Newfield site."  (Compl. ¶ 12)  Since approximately 2000, Shieldalloy has been working to obtain NRC approval of the final decommissioning plan, which also contemplates capping the waste on-site.

In 2009, the State of New Jersey assumed from the NRC regulatory authority for Shieldalloy's source material license, meaning that the decommissioning plan must now be approved by the

State of New Jersey, not the NRC.  (Senior Cert. Ex. T)  New
Jersey contends that on-site containment does not comply with NJ
DEP regulations, and has asked Shieldalloy to submit a revised
decommissioning plan.  (Id.)

In September, 1993, Shieldalloy and its parent company,
Metallurg, Inc., filed voluntary chapter 11 petitions in the
United States Bankruptcy Court for the Southern District of New
York.[4]  The State of New Jersey, on behalf of NJ DEP, filed a
proof of claim, totaling $11.26 million, "for all cleanup and
removal costs incurred by [NJ DEP] in connection with the
[Newfield] Site, including oversight costs, penalties, costs of
response actions and natural resource damage claims."  (Proof of
Claim, Ex. B to Defs' Reply Brief)

New Jersey's proof of claim was not a surprise to
Shieldalloy; as early as 1988 Shieldalloy had been cooperating
with New Jersey under an Administrative Consent Order ("ACO")
which "require[d] the cleanup and/or remediation of hazardous

---

[4]  Metallurg, Inc. is incorporated in New York and its
principal place of business is New York City.  Shieldalloy is
currently incorporated in Delaware and its principal place of
business is New Jersey.  It appears that Shieldalloy was
incorporated in New York at the time of its bankruptcy.  (Compl.
Ex. A)

4

substances and pollutants known or subsequently discovered at the Newfield site."  (Compl. Ex. A)[5]

The United States Environmental Protection Agency (EPA) and the Department of the Interior, as well as the NRC, also filed proofs of claim alleging liability in connection with the Newfield Site.  (Compl. ¶ 19)

In December, 1996, while Shieldalloy and Metallurg were still in bankruptcy, they entered into a "Settlement Agreement of Environmental Claims and Issues by and Between the Debtors and the United States of America and the State of New Jersey" ("the Settlement Agreement") (Compl. Ex. A).  The Settlement Agreement provides, in relevant part,

> 7.  With respect to the treatment of . . . the New Jersey Proofs of Claim, under the Debtors' Plan of Reorganization[,] the Debtors and . . . New Jersey agree as follows:
>
> . . .
>
> B.  Allowance of New Jersey Claims
>
> i.  New Jersey shall have an Allowed General Unsecured Claim against Shieldalloy in the amount of $638,508.20 for prepetition response costs incurred by NJDEP;
>
> j.  New Jersey shall have an Allowed

---

[5]  Shieldalloy's obligations under the 1988 ACO, and a prior 1984 ACO, were secured by a trust fund of approximately $8 million and letters of credit in the amount on $8.2 million. (Senior Cert. Ex. J)

General Unsecured Claim against Shieldalloy in the amount of $1,196,982.84 for prepetition New Spill Fund Authorization;

k.  New Jersey shall have an Allowed Administrative Claim against Shieldalloy in an amount of not less than $262,912.12, but not more than $270,242.69 . . .

l.  Within six months after substantial consummation of the Plan of Reorganization . . . Shieldalloy shall commence the enhancement, restoration and creation of certain wetlands in and around the Newfield site. . . . In compensation for the claim for natural resource damages for interim lost use of groundwater, New Jersey shall have an allowed general unsecured claim against Shieldalloy in the amount of $1,311,000 . . . . The completion of these actions shall constitute full satisfaction of New Jersey's pre-petition claims for damages to wetlands, and for interim lost use of groundwater.

. . .

38.  Except for those claims specifically settled pursuant to paragraphs 7, 8, and 9 of this Settlement Agreement, Shieldalloy's environmental liabilities at the Newfield site, including its liability to the United States and New Jersey, shall be excepted from discharge and shall pass through Shieldalloy's Chapter 11 case unaffected.  The Plan of Confirmation [sic] or other Order confirming the Plan shall contain a provision identical to this paragraph 38.  The parties agree that post-confirmation date response costs claims of the United States and New Jersey against Shieldalloy are not being settled under this Settlement Agreement.

(Compl. Ex. A)

Shieldalloy's and Metallurg's Joint Plan of Reorganization

was confirmed by the bankruptcy court on February 26, 1997.

(Metallurg, Inc. Form 10-Q(1) for the quarterly period ended

October 31, 1997[6]) "Transactions contemplated by the Plan were consummated on April 14, 1997."  (Id.)

## II.

There are two types of challenges to a district court's subject matter jurisdiction[7]: facial attacks and factual attacks. *Common Cause v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). "Facial attacks . . . contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true." *Id.*

Factual challenges are different.  Such challenges have "three important procedural consequences." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).  First, the complaint's allegations are not presumed to be true.  *Id.*  Second, the burden of proving, by a preponderance of the evidence, the existence of

---

[6]  Available at http://www.sec.gov/Archives/edgar/data/1030992/0000897204-97-000311.txt.

[7]  NJ DEP has raised lack of subject matter jurisdiction in its motion pursuant to Fed. R. Civ. P. 12(b)(6).  However, lack of subject matter jurisdiction is properly raised by motion pursuant to Fed. R. Civ. P. 12(b)(1).  This procedural misstep is of no consequence though, because the Court has an obligation to determine, *sua sponte*, its subject matter jurisdiction. *Meritcare, Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 216 (3d Cir. 1999); *see also* Fed. R. Civ. P. 12(h)(3) ("whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") (emphasis added).

subject matter jurisdiction, rests with the plaintiff.  *Id.*
Third, this Court may "make factual findings which are decisive to
the issue." *Id.* (internal citation and quotation omitted).

The instant motion raises one facial challenge (sovereign
immunity[8]) and one factual challenge (statutory subject matter
jurisdiction).

## III.

NJ DEP moves to dismiss asserting that (1) Shieldalloy's suit
is barred by the Eleventh Amendment to the United States
Constitution and, (2) there is no statutory basis for this Court's
subject matter jurisdiction.  The Court addresses each issue in
turn.

### A.

Constitutional principles of sovereign immunity embodied in

---

[8] State sovereign immunity is not simply a defense to the
claims asserted.  It is a "constitutional principle" that
"limit[s] the federal courts' jurisdiction under Article III,"
*Seminole Tribe v. Fla.*, 517 U.S. 44, 64 (1996), therefore the
Court considers Defendants' Motion to Dismiss on the basis of
sovereign immunity as attacking subject matter jurisdiction.

the Eleventh Amendment, and elsewhere in our "constitutional framework"[9], bar this suit in its entirety.

The Court's analysis begins with the basic premise that NJ DEP and Acting Commissioner Mauriello, sued in his official capacity only, are immune from private suit because "[s]tate governments and their subsidiary units are immune from suit in federal court under the Eleventh Amendment," and "'official-capacity suits generally represent only another way of pleading an action' against the state." *Betts v. New Castle Youth Dev. Ctr.*, __ F.3d __ , 2010 U.S. App. LEXIS 19052 (3d Cir. Sept. 13, 2010) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

The question then becomes, do any of the exceptions to sovereign immunity apply?

### (1)

While this suit does primarily seek prospective declaratory

---

[9]   *FMC v. S.C. State Ports Auth.*, 535 U.S. 743, 753-54 (2002) (explaining that "the Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity. . . . the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment."); *see also Hans v. Louisiana*, 134 U.S. 1 (1890) (holding that sovereign immunity barred a federal question suit against a State brought by one of its own citizens, even though the text of the Eleventh Amendment only addresses suits brought by citizens of another State).

and injunctive relief against a state officer[10], the doctrine first established by *Ex Parte Young*, 209 U.S. 123 (1908), does not apply because the complaint alleges violations of *state* law only. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("We conclude that *Young* . . . [is] inapplicable in a suit against state officials on the basis of state law.").[11]

Moreover, Acting Commissioner Mauriello is merely a co-defendant along with NJ DEP.  Nothing about this suit suggests that it is aimed a Mauriello's actions, apart from NJ DEP itself. *See MCI Telecomm. Corp. v. Bell Atlantic --Pennsylvania,* 271 F.3d 491, 506 (3d Cir. 2001) ("*Young* does not apply if, although the action is nominally against individual officers, the state is the real, substantial party in interest and the suit in fact is against the state.") (*citing Pennhurst*); *see also Great Northern*

---

[10]  This suit *primarily* seeks declaratory and injunctive relief but also seeks damages.  (See Compl. ¶¶ 63(b), 68(b), 77(b); "Prayer for Relief" clause, section (d))

[11]  In one sentence in its opposition brief, Shieldalloy asserts that *Ex Parte Young* applies because the suit seeks "injunctive relief for an ongoing violation of federal law." (Opposition Br. p. 24)  However, Shieldalloy does not identify what federal law it asserts Mauriello is violating.
    Indeed, on the very same page of its brief, Shieldalloy asserts "Shieldalloy States a Breach of Contract Claim Based Upon the Settlement Agreement."  The Court fails to ascertain a plausible violation of federal law arising out of such a claim, or the other related promissory estoppel, equitable estoppel, breach of good faith, and public nuisance claims.

*Life Ins. Co. v. Read*, 322 U.S. 47 (1944) (holding that a damages suit against a state officer in his official capacity was barred because it was functionally a suit against the State).  Thus, *Ex Parte Young* does not apply.[12]

**(2)**

Nor is there any basis for finding congressional abrogation of sovereign immunity in this case.  First, Shieldalloy asserts no federal cause of action that could even provide the basis for an abrogation argument.[13]  Second, congressional abrogation is a somewhat narrow exception to sovereign immunity.  The Supreme Court has held that Congress may not abrogate sovereign immunity pursuant to its Article I powers; only legitimate exercises of

---

[12]  In light of this Court's finding that this suit is ostensibly against the State of New Jersey and not Acting Commissioner Mauriello, the remainder of this opinion will refer both named Defendants as "NJ DEP."

[13]  Shieldalloy argues that "Congress specifically abrogated any claim of sovereign immunity with respect to the operation of specific sections of the Bankruptcy Code" and that those sections are "implicated" by the facts of this case.  (Opposition Br. p. 21-22) 11 U.S.C. § 106(a)(2) provides that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated . . . . The court may hear and determine any issue with respect to the application of [the Bankruptcy Code sections enumerated in § 106(a)(1)] to governmental units."  The instant claims do not "raise any issue with respect to" any provision of the Bankruptcy Code, much less the particular provisions enumerated in § 106(a)(1), therefore the congressional abrogation in that section does not apply.

11

legislative power pursuant to § 5 of the Fourteenth Amendment to
the United States have been held to abrogate immunity.  *See Fla.
Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527
U.S. 627, 636-37 (1999).  Such legislation simply is not
implicated by the facts of this case.

### (3)

Lastly, a state may consent to suit in federal court, thereby
waiving its sovereign immunity.  Shieldalloy makes two consent /
waiver arguments.

*Waiver through litigation conduct*

First, Shieldalloy asserts that NJ DEP waived sovereign
immunity through its actions in the prior bankruptcy case.  *See
generally Lapides v. Bd. of Regents,* 535 U.S. 613 (2002) (holding
that a state defendant waives sovereign immunity when it removes a
state court case to federal court, thereby deliberately invoking
the federal court's subject matter jurisdiction).  Specifically,
Shieldalloy argues that by filing its proof of claim in the
bankruptcy case, NJ DEP waived its sovereign immunity as to the
claims asserted in this case.

The question is whether NJ DEP's waiver of sovereign immunity in the prior bankruptcy case[14] extends to the instant suit.  The Third Circuit has not addressed the effect of a sovereign immunity waiver on a subsequent lawsuit between the same parties; indeed only two Courts of Appeal appear to have considered the issue. Both have concluded that a sovereign immunity waiver in a prior lawsuit did not extend to a later, separate suit (i.e., not a continuation of the same suit).

In *Biomedical Patent Management Corp. v. California*, the Federal Circuit held that California's waiver of sovereign immunity in a prior lawsuit did not extend to a subsequent suit between the same parties.  505 F.3d 1328 (Fed. Cir. 2007).[15]  The court rejected the plaintiff's argument that immunity "extends or carries over" simply because the subsequent suit "involves the same subject matter and the same parties."  *Id.* at 1334.  The court then explained,

---

[14]  Filing a proof of claim in bankruptcy waives sovereign immunity *within the bankruptcy case* as to "those adversarial claims that are both 'property of the estate' and 'arise out of the same transaction or occurrence' as the claims set forth in the proof of claim."  *In re: Kaiser Group Int'l, Inc.*, 399 F.3d 558 (3d Cir. 2005) (quoting 11 U.S.C. § 106(b)); *see also Gardner v. New Jersey,* 329 U.S. 565, 574 (1947) ("When the State becomes the actor and files a [proof of] claim against the [bankruptcy] fund, it waives any immunity which it otherwise might have had respecting the adjudication of the claim.").

[15]  Cert. denied, 129 S.Ct. 895 (2009).

13

we do not mean to draw a bright-line rule whereby a State's waiver of sovereign immunity can never extend to a re-filed or separate lawsuit.  We note only that . . . a State's waiver of immunity generally does *not* extend to a separate or re-filed suit, and that, . . . even a waiver by litigation conduct must nonetheless be clear.  These principles, of course, are related, as a waiver that does not 'clearly' extend to a separate lawsuit generally would not preclude a State from asserting immunity in that separate action.

*Id.* at 1340 (internal citations and quotations omitted).

Importantly, not only did *Biomedical* involve the same parties and the same subject matter, the claims in the two suits were identical.  In the first suit, a subcontractor of the State of California filed suit seeking a declaration that laboratory services performed by California's Department of Health Services ("DHS") did not infringe Biomedical's '693 patent.  *Biomedical*, 505 F.3d at 1331.  DHS intervened-- also seeking a declaration of non-infringement of the '693 patent-- thereby waiving its sovereign immunity in the first suit.  *Id.*  Then, Biomedical asserted its compulsory counterclaim of infringement of the '693 patent against DHS.  *Id.*

The first suit was ultimately dismissed without prejudice for lack of venue.  *Biomedical*, 505 F.3d at 1331.  More than eight years later, Biomedical filed suit against DHS asserting infringement of the '693 patent.  *Id.*  The Federal Circuit specifically noted that the four counterclaims Biomedical asserted

14

in the first suit were "the same four counts" it asserted in the second suit. *Id.* The first and second suits in *Biomedical* were therefore practically identical, yet the Federal Circuit held that DHS's waiver did not extend to the second suit.

The Ninth Circuit, in a case factually and procedurally similar to the instant case, also concluded that a prior waiver of sovereign immunity in one case did not extend to a subsequent suit between the same parties. In *Montana v. Goldin (In re: Pegasus Gold Corp.*), the State of Montana's Department of Environmental Quality ("DEQ") filed proofs of claim in Pegasus's (and its affiliates') chapter 11 case. 394 F.3d 1189, 1192 (9th Cir. 2005). "The[] claims pertained to the Debtors' reclamation obligations and various environmental compliance and clean up obligations." *Id.* Pegasus and DEQ entered into a settlement agreement (which was approved by the bankruptcy court) resolving the "financial responsibility for reclamation and water treatment." *Id.* Shortly thereafter, the bankruptcy court confirmed the debtors' plan. *Id.*

A few years later, after "a series of billing disputes," the bankruptcy trustee and Pegasus[16] filed suit against the State

---

[16]   The actual entity that filed suit was Reclamation Services Corporation, which Pegasus created in order to fulfill its reclamation and clean up obligations under the settlement agreement.

15

alleging breach of the settlement agreement and the bankruptcy plan, among other claims. *Goldin,* 394 F.3d at 1192.

In determining whether DEQ's sovereign immunity waiver in the bankruptcy case extended to the subsequent suit, the Ninth Circuit applied the same test it employs for determining the scope of sovereign immunity waivers within a bankruptcy case: "the state waives its Eleventh Amendment immunity with regard to the bankruptcy estate's claims *that arise from the same transaction or occurrence as the state's claim.*" *Goldin*, 394 F.3d at 1195 (internal citation and quotation omitted; emphasis in *Goldin*)  To determine whether a claim arises out of the same transaction or occurrence the court applied the "'logical relationship' test for compulsory counterclaims." *Id.* at 1195-96.  If "the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant," a logical relationship exists and the defendant must assert its counterclaim.  *Id.* at 1196 (internal citation and quotation omitted).

Applying this standard, the court held that DEQ's proofs of claim, which sought compensation for "various environmental obligations of the Debtors" due to the "insufficiency of the Debtors' reclamation bonds," did not "arise from the same

16

aggregate set of operative facts as [the trustee's and Pegasus's]

claims for [] post-confirmation breach of contract." *Goldin*, 394

F.3d at 1196.  Specifically, the court explained,

> [w]hile the State's proofs of claim (seeking
> environmental compliance) and the settlement agreement
> (creating an entity to effect compliance) obviously
> involve the same general subject matter, the timing of
> events here [is] critical . . . . [T]he Debtors could
> not have asserted any type of counterclaim against the
> State at the time it filed its proofs of claims. . . .
> [I]t would be hard to conclude that the Debtors in this
> case had a compulsory bankruptcy counterclaim regarding
> a company yet to be formed or an agreement yet to be
> made.

*Id.* at 1196.

Thus, the court concluded, DEQ's sovereign immunity waiver,

effected by its proof of claim in the bankruptcy case, did not

extend to the post-confirmation contract suit.

This Court need not choose between *Biomedical's* analysis and

*Goldin's* analysis[17] because the result is the same applying either

case.  Both cases clearly establish that a prior sovereign

immunity waiver does not extend to a subsequent suit simply

because that suit is between the same parties and involves the

same subject matter as the previous suit.  Thus, the mere fact

that the instant suit is between Shieldalloy and NJ DEP, and

---

[17] The two cases are in apparent conflict insofar as
*Biomedical* involved a compulsory counterclaim, and thus would
likely have met *Goldin's* logical relationship test.

involves the Newfield Site, is clearly insufficient to extend NJ DEP's waiver.

Moreover, both *Goldin* and *Biomedical* establish that the claims asserted in the subsequent suit must be, *at least* closely related to the claims asserted in the first suit where sovereign immunity was waived.  Shieldalloys claims are not sufficiently related to NJ DEP's proof of claim.

Like in *Goldin*, Shieldalloy could not have asserted the instant claims against NJ DEP in the bankruptcy case because such claims could not have possibly existed at the time.  It is clear that the State of New Jersey, at the time of the bankruptcy, did not have the authority to order Shieldalloy to remove the baghouse dust and slag; it acquired that authority from the NRC in 2009. (Senior Cert. Ex. T)  Moreover, NJ DEP's proof of claim sought recovery of costs it incurred in cleaning up and remediating the Newfield Site, whereas the instant dispute centers around the costs Shieldalloy will incur in connection with permanently decommissioning the Newfield Site.[18]

---

[18]   And if asserting the same compulsory counterclaim in a subsequent suit is not enough to extend a waiver of sovereign immunity, as was the holding of *Biomedical*, then certainly Shieldalloy cannot claim in this suit the benefit of NJ DEP's prior waiver.

18

While Shieldalloy attempts to characterize the instant suit as a mere continuation of its bankruptcy case, it is not. Shieldalloy and NJ DEP's many disputes concerning the Newfield Site pre-existed the bankruptcy, certain disputes "pass[ed] through Shieldalloy's Chapter 11 case unaffected" (Compl. Ex. A), and disputes continued after the bankruptcy.  The instant dispute did not (and could not) arise until 2009, when NJ DEP acquired licensing authority from the NRC.  NJ DEP did not waive its sovereign immunity defense to this suit by filing proofs of claim in the prior bankruptcy case.

*The Bankruptcy Clause of the United States Constitution*

In 2006, the Supreme Court explained that in ratifying the United States Constitution, which included the Bankruptcy Clause[19], the "States[] acquiesce[d] in a grant of congressional power to subordinate[,] to the pressing goal of harmonizing bankruptcy law[,] sovereign immunity defenses that might have been asserted in bankruptcy proceedings."  *Central Va. Community College v. Katz*, 546 U.S. 356, 362 (2006).  Examining the history of the Bankruptcy Clause, the Court found that all states have

---

[19]  The Bankruptcy Clause grants Congress power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. Art. I, § 8, cl. 4.

consented to "*limited* subordination of state sovereign immunity in the bankruptcy arena." *Id.* at 636 (emphasis added).

The question is how does *Katz* apply to this case-- has New Jersey, through the operation of the Bankruptcy Clause, consented to the claims asserted by Shieldalloy in the instant suit?[20]

Shieldalloy interprets *Katz* as holding that "sovereign immunity does not exist with respect to bankruptcy proceedings." (Opposition Br. p. 19)  This Court does not interpret *Katz* as broadly.  Indeed, the Supreme Court itself clarified, "[w]e do not mean to suggest that every law labeled a 'bankruptcy' law, could consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity." *Katz,* 546 U.S. at 378 n.15.

*Katz's* holding must, of course, be considered in light of its facts.  The proceeding in *Katz* was an action brought by the chapter 11 trustee "to avoid and recover preferential transfers made by the debtor when it was insolvent."  546 U.S. at 360.[21]  The nature of the proceeding itself was important.  The Court explained,

---

[20]  With respect to this issue, the Court assumes *arguendo* that this case is bankruptcy case.  However, as set forth *infra*, this Court concludes that it lacks subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

[21]  The avoidance and recovery of preferential transfers are core proceedings under 28 U.S.C. § 157(b)(2)(F).

those who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid preferential transfers and to recover the transferred property.  Petitioners do not dispute that that authority has been a core aspect of the administration of bankrupt estates since at least the 18th century.

*Id.* at 372.  While the Court concluded that it need not decide whether the preference avoidance proceeding itself was an *in rem* action, *see id.* at 372, the fact that the proceeding was at least "ancillary to the bankruptcy courts' *in rem* jurisdiction," *id.* at 373, was critical to the Court's holding:

States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'  The scope of this consent was limited; the jurisdiction exercised in bankruptcy proceedings was chiefly *in rem* -- a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdiction.  But while the principal focus of the bankruptcy proceedings is and was always the res, some exercises of bankruptcy courts' powers -- issuance of writs of habeas corpus included -- unquestionably involved more than mere adjudication of rights in a res.  In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted *in proceedings necessary to effectuate the* in rem *jurisdiction of the bankruptcy courts.*

*Id.* at 377-78 (emphasis added; internal citations omitted).

Thus the question becomes, is the instant post-confirmation suit a proceeding "necessary to effectuate the *in rem*

jurisdiction" of this Court?  The answer is plainly no.  There is no bankruptcy estate over which to exercise *in rem* jurisdiction.

Moreover, the claims asserted here-- various state common law contract claims and a public nuisance claim-- are vastly different from the claim at issue in *Katz* (avoidance and recovery of a preferential transfer) and the claim at issue in the case upon which *Katz* relied, *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 443 (2004) (discharge of a student loan debt).[22]  The claims in *Katz* and *Hood* were claims created by the Bankruptcy Code, directly implicating the "[c]ritical features of every bankruptcy proceeding": "the exercise of exclusive jurisdiction over all the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that . . . releas[es] him, her or it from further liability on old debts."  *Katz*, 546 U.S. at 363-64.[23]  The claims asserted here are

---

[22]  *Hood* held that the Eleventh Amendment did not apply to a debtor's claim against an arm of the state for discharge of her student loan debt because "the exercise of [the bankruptcy court's] *in rem* jurisdiction to discharge a debt does not infringe on state sovereignty."  541 U.S. at 448.

"[D]eterminations as to the dischargeability of particular debts" are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I).

[23]  *See also, State of Texas v. Soileau (In re: Soileau)*, 488 F.3d 302, 307 (5th Cir. 2007) ("[w]hatever uncertainty there may be as to the outer limits of the holdings *Katz* and *Hood*, at the very least they together establish beyond cavil that an *in rem* bankruptcy proceeding brought merely to discharge a debt or debts by determining the rights of various creditors in a debtor's

not Bankruptcy Code claims and do not directly implicate the critical features of bankruptcy proceedings.

*Florida Department of Revenue v. Omine (In re: Omine)*, cited by Shieldalloy, further illustrates this Court's distinction between actions that are within the bankruptcy court's ancillary *in rem* jurisdiction and actions that are not.  485 F.3d 1305, 1313-14 (11th Cir. 2007).  In *Omine* the Eleventh Circuit affirmed the district court's holding, based on *Katz*, that the State of Florida could not assert a sovereign immunity defense to a damages claim based on its asserted violation of the automatic stay.  The court reasoned,

> [c]ourts have long recognized that the automatic stay is fundamental to the reorganization process. . . . While motions for contempt and seeking sanctions that include attorneys fees and costs for violating the automatic stay may resemble money damage lawsuits *in form*, it is their *function* that is critical, and their *function* is to facilitate the *in rem* proceedings that form the foundation of bankruptcy. . . .
>      . . . [W]e agree with the district court that, pursuant to *Katz*, actions to force a creditor to honor the automatic stay are the types of 'proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy court,' and that, therefore, the Florida DOR may not assert sovereign immunity here.

_____

estate-- such as is brought here-- in no way infringes the sovereignty of a state as a creditor. . . . In this case, the State challenges the *in rem* discharge of a debt, a specie of imposition on the states' sovereignty undeniably countenanced by *Katz* and *Hood*.").

23

*Omine*, 485 F.3d at 1313-14 (quoting *Katz*).

While this suit is also an action for damages, it does not function to effectuate the bankruptcy court's *in rem* jurisdiction. Violating the automatic stay directly interferes with "'the exercise of exclusive jurisdiction over all of the debtor's property [and] the equitable distribution of that property among the debtor's creditors,'" "'critical features of every bankruptcy proceeding.'" *Omine*, 485 F.3d at 1313 (quoting *Katz*).  Indeed, "the automatic stay is equivalent to a court order," and "[a] violation of the stay is punishable as contempt of court."  3-362 Collier on Bankruptcy 362.12; *see, e.g. Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325 (3d Cir. 1990) (affirming imposition of contempt sanctions for willful violation of the automatic stay).

Allegedly breaching an agreement settling a claim in bankruptcy is not akin to violating the automatic stay.  It does not directly implicate the critical features of every bankruptcy proceeding, and does not have the potential to disrupt the entire bankruptcy process in the way that violating the automatic stay does.

Because the claims at issue in this case are not ancillary to the Court's *in rem* bankruptcy jurisdiction, the Court does not "operate[] free and clear of the State's claim of sovereign

immunity." *Katz*, 546 U.S. at 372.  The claims are not of the type "[t]he Framers would have understood" to be included within "laws 'on the subject of Bankruptcies.'" *Id.* at 370.  Shieldalloy's argument fails.

In conclusion, the Court holds that none of the exceptions to state sovereign immunity-- the doctrine of *Ex Parte Young*, congressional abrogation, and waiver / consent-- apply to this case.  Accordingly, Defendants' Motion to Dismiss based on sovereign immunity will be granted.

**B.**

Alternatively, this Court lacks statutory subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).[24]  The statute provides, in relevant part,

> . . . the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

---

[24] The Court rejects Shieldalloy's assertion that federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.  Under the well-pleaded complaint rule, a cause of action "arises under" federal law, and jurisdiction is proper, only if a federal question is presented on the face of the plaintiff's properly pleaded complaint.  *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9-12 (1983).  The instant Complaint alleges only state law causes of action.

28 U.S.C. § 1334(b).

The issue is whether the post-confirmation claims asserted here are sufficiently "related to" Shieldalloy's bankruptcy case, which concluded in 1997.

"[B]ankruptcy court jurisdiction diminishes with plan confirmation [but] does not disappear entirely." *Resorts Int'l Financing, Inc. et al. v. Price Waterhouse & Co., LLP (In re: Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004). "At the post-confirmation stage," the district court may only exercise subject matter jurisdiction over "claim[s] [that] affect an integral aspect of the bankruptcy process-- there must be a close nexus to the bankruptcy plan or proceeding." *Id.* at 167. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* On the other hand, the district court may not exercise jurisdiction over "dispute[s] essentially collateral to the bankruptcy case." *Id.*

*Resorts International* and *In re: Shenango Group, Inc.*, 501 F.3d 338 (3d Cir. 2007), serve as helpful guideposts-- *Resorts International* demonstrating what type of case falls outside the district court's post-confirmation "related to" jurisdiction, and *Shenango Group* demonstrating what is encompassed within that jurisdiction.

26

In *Resorts International,* the trustee for the debtor's litigation trust brought an accounting malpractice adversary proceeding in bankruptcy court against Price Waterhouse & Co. in connection with accounting services performed for the trust. 372 F.3d at 156-57. The reorganized debtor was not a party to the suit. *Id.* at 157. The suit was filed almost seven years after the debtor's plan of reorganization was confirmed. *Id.* at 159.

Price Waterhouse moved to dismiss the suit for lack of jurisdiction, arguing that "the Litigation Trust, a legally distinct entity, is not a continuation of the bankruptcy estate for jurisdictional purposes," and that "the debtor is only tangentally affected by [the] malpractice action after it assigned away its rights in the litigation claims, and the Litigation Trust beneficiaries traded away their creditor status to attain rights to the Trust's assets." *Resorts Int'l*, 372 F.3d at 157. The bankruptcy court and the Third Circuit agreed.

The Third Circuit explained, "the resolution of [the] claims will not affect the [bankruptcy] estate; it will only have incidental effect on the reorganized debtor [and] it will not interfere with the implementation of the Reorganization Plan." *Resorts Int'l*, 372 F.3d at 169.

The Court rejected arguments that the litigation would directly effect the estate and the debtor, explaining that any

27

effect on either would only be attenuated.  As to the estate, the Court observed that

> the Litigation Trust was created in part so that the Plan could be confirmed and the debtor freed from bankruptcy court oversight without waiting for the resolution of the litigation claims.  The deliberate act to separate the litigation claims from the bankruptcy estate weakens the Trustee's claim that the Litigation Trust has the same jurisdictional nexus as that of the estate.

*Resorts Int'l*, 372 F.3d at 169.

As to the debtor, the Court noted that it was not a party to the suit, and while the debtor might receive some funds if the Litigation Trust prevailed in the malpractice suit, those funds "would [only] be incidental to the bankruptcy process."  *Resorts Int'l*, 372 F.3d at 170.

Moreover, with respect to the effect of the suit on both the estate and the debtor, the Court observed, "[r]esolution of this matter will not require a court to interpret or construe the Plan or the incorporated Litigation Trust."  *Resorts Int'l*, 372 F.3d at 170.

For all of these reasons, *Resorts International* held that the malpractice suit lacked the requisite close nexus to the bankruptcy to support jurisdiction pursuant to 28 U.S.C. § 1334(b).

On the other hand, the Third Circuit held that the suit at issue in *Shenango Group* had the requisite close nexus.  501 F.3d at 341.  The dispute centered around whether Shenango (the debtor) was required, under the Confirmed Plan of Reorganization, to fully fund certain pension benefits to Shenango's retirees.  *Id.* at 341.  Several years after Shenango's chapter 11 plan was confirmed, the retirees moved to reopen the bankruptcy case, and to compel compliance with the Reorganization Plan.  *Id.* at 342.  The bankruptcy court, the district court and the Third Circuit all agreed that the suit was sufficiently related to the bankruptcy case.  *Id.* at 343.

The Third Circuit distinguished Shenango's case from *Resorts International*, noting that the debtor was a party to the suit at issue, and that the

> dispute concerns . . . the interpretation of the [Reorganization] Plan's provision relating to the debtor's liability for fully funding any benefit increases to [retirees].  That potential liability supplies the close nexus. . . . [T]he effect on the debtor's liabilities will be more than incidental.

*Shenango*, 501 F.3d at 344.

Shieldalloy argues that this suit is analogous to *Shenango* and distinguishable from *Resorts International* because like *Shenango* (and unlike *Resorts*) it, the reorganized debtor, is a party to the suit, and any liability determination will directly

affect it.  Shieldalloy also asserts that adjudicating its claims will require interpretation of the Settlement Agreement (which was incorporated into its confirmed reorganization plan) because Shieldalloy asserts that NJ DEP breached the Settlement Agreement.

These superficial similarities notwithstanding however, the Court concludes that the facts of this case demonstrate that it is not sufficiently related to Shieldalloy's prior bankruptcy case.

While the Complaint does assert that NJ DEP breached the Settlement Agreement, merely pleading that a breach occurred does not satisfy Shieldalloy's burden of establishing jurisdiction. Artful pleading cannot confer subject matter jurisdiction on a court. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673 (1950).  NJ DEP's assertion that the Settlement Agreement did not address the issue of decommissioning is amply supported by the record.

The Settlement Agreement did exactly as its title suggests; it settled NJ DEP's proof of claim filed in the bankruptcy.  That proof of claim concerned remedial costs already incurred by the State of New Jersey.  It did not address Shieldalloy's future decommissioning actions (whether on the Newfield Site or otherwise).

Indeed, the Settlement Agreement could not have addressed decommissioning for two reasons.

30

First, as a matter of law, any obligation Shieldalloy had to the State of New Jersey with regard to future decommissioning actions Shieldalloy itself would be required to perform would not be a claim in bankruptcy.  When a state "forces the debtor to comply with applicable environmental laws by remedying an existing hazard" it is not asserting a cognizable "claim" in bankruptcy; only when a state "forces the debtor *to pay money to the state*" is the state acting as a creditor.  *Torwico Electronics Inc. v. State of New Jersey (In re Torwico Electronics, Inc.)*, 8 F.3d 146, 150 (3d Cir. 1993) (emphasis added) (relying on *In re Chateaugay*, 944 F.2d 997 (2d Cir. 1991)).  The dispute here concerns the former: Shieldalloy filed this suit because NJ DEP intends to force it to expend its own money to remove the baghouse dust and slag itself; NJ DEP is not seeking reimbursement for costs it incurred in removing the waste.  At issue is Shieldalloy's obligation to comply with New Jersey environmental regulations, which could not have been a claim in bankruptcy.

Second, as a matter of fact, the Settlement Agreement between Shieldalloy and NJ DEP could not have addressed decommissioning because when the agreement was negotiated and signed, the NRC, not NJ DEP, had regulatory authority over decommissioning.  It would be impossible for NJ DEP to agree to a particular decommissioning

plan because it only obtained regulatory authority over
decommissioning in 2009.

Thus, contrary to Shieldalloy's assertions, in adjudicating
this dispute concerning the decommissioning of the Newfield Site,
the Court will not be required to apply or interpret the
Settlement Agreement.   The Settlement Agreement does not address
decommissioning.[25]

While it is true that this suit involves a dispute between
the reorganized debtor and its former creditor, that fact alone is
insufficient to establish the requisite close nexus.   Under such a
standard, any suit between a former debtor and creditor, however
unrelated to the previous bankruptcy case, would be encompassed by
the district court's "related to" jurisdiction.   Identity of the
parties is just one factor to consider in deciding the heart of
the issue: whether the dispute between those parties "affect[s] an

---

[25]   While Shieldalloy appeared to concede at oral argument
that the Settlement Agreement itself does not explicitly address
Shieldalloy's plans for on-site remediation, it asserted that but
for a commitment from New Jersey regarding the general concept of
on-site remediation (as opposed to off-site disposal) Shieldalloy
would never have entered into the Settlement Agreement.   However,
this argument actually undercuts Shieldalloy's position.   Given
the asserted importance of on-site remediation, one would expect
the Settlement Agreement to have addressed it.   The absence of any
provision regarding on-site remediation is therefore quite
telling, particularly in light of the Settlement Agreement's
integration clause, which states that the agreement "constitutes
the sole and complete agreement of the parties."   (Compl. Ex. A)

integral aspect of the bankruptcy process." *Resorts Int'l*, 372 F.3d at 167.

As already explained *supra* at III, A., 3, while Shieldalloy attempts to characterize the instant suit as a mere continuation of its bankruptcy case, it is not.  Shieldalloy and NJ DEP's many disputes concerning the Newfield site pre-existed the bankruptcy, certain disputes "pass[ed] through Shieldalloy's Chapter 11 case unaffected" (Compl. Ex. A), and disputes continued after the bankruptcy.  The instant dispute did not (and could not) arise until 2009, when NJ DEP acquired licensing authority from the NRC. It therefore lacks the requisite close nexus to the bankruptcy case, and this Court lacks subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).  NJ DEP's Motion to Dismiss will be granted.

**IV.**

For the reasons set forth above, this Court lacks subject matter jurisdiction over the present suit.  Accordingly, the Defendants' Motion to Dismiss will be granted.  An appropriate Order accompanies this Opinion.

Date: October 14, 2010          s/ Joseph E. Irenas
                                JOSEPH E. IRENAS, S.U.S.D.J.